**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Daniel JUDON, Defendant-Appellant.**

**No. 77–5044.**

United States Court of Appeals, Fifth Circuit.

Feb. 15, 1978.

J. Louis Wilkinson, Birmingham, Ala., (Court-appointed), for defendant-appellant.

J. R. Brooks, U. S. Atty., Bill L. Barnett, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before TUTTLE, CLARK and RONEY, Circuit Judges:

CLARK, Circuit Judge:

Defendant Daniel Judon appeals his conviction of entering a federally-insured savings and loan association with the intent to commit therein a felony affecting the savings and loan association, in violation of 18 U.S.C.A. § 2113(a) (Supp.1977). We consider three issues on this appeal. First, whether the Jencks Act, 18 U.S.C.A. § 3500 (1969), required the production by the prosecution of certain interview reports prepared by the Federal Bureau of Investigation agents who investigated this case on forms designated FD–302 (popularly called 302's). Second, whether *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), required the production of these same 302's. Third, whether Fed.R.Evid. 803(5) prohibited the admission into evidence of the recorded recollection of a prosecution witness. Because we are unable to determine from the face of the 302's whether they are "statements" required to be produced by the Jencks Act, we remand to the district court to make that determination based on extrinsic evidence of the circumstances surrounding the making of the 302's. The remaining issues are without merit.

The 302's in issue are those reporting interviews of Betty Barnett, manager of the robbed savings and loan branch and present during the robbery, and Deborah Beasley, teller at the branch and also present during the robbery. At trial both Barnett and Beasley identified Judon as the person who had robbed the branch, and both recounted what occurred during the robbery. FBI agent Kenneth W. Tanana interviewed Barnett on November 8, 1976, the day of the robbery, and dictated the report on November 10, 1976; agent Frank R. Slapikas interviewed Beasley on November 8 and dictated his report on November 15. Each report was dictated in the third person ("Barnett stated . . ."; "Beasley advised . . ."), each contained the witness' detailed account of what occurred during the course of the robbery, and each contained the witness' description of the perpetrator. Significantly, each 302 concluded with a paragraph saying that the witness had been shown mug shots of sever-

al persons and that the witness picked persons other than Judon as "being similar to" or "as resembling" the robber.

At the conclusion of Barnett's direct examination by the prosecutor at trial, Judon's counsel requested any material he was entitled to under the Jencks Act, specifically any 302 in the possession of the government. The government refused to produce the 302 in question, although it did produce another statement Barnett had previously made and did deliver Tanana's 302 to the trial judge *in camera*. The trial judge did not require its production. Judon's counsel made a similar request following Beasley's direct testimony. The government submitted Slapikas' 302 to the court for inspection, and following a fifteen minute recess the judge similarly refused to require its production. The 302's, though never seen by Judon or his counsel, were marked as exhibits and sealed to be sent to this court for review.

The Jencks Act requires the government in any criminal prosecution brought by the United States to produce, after a witness called by the government has testified on direct examination, any statement of the witness in the possession of the government which relates to the subject matter as to which the witness has testified. 18 U.S. C.A. § 3500(b). Since the subject matter of the interview reports here related to the subject matter of the testimony of the witnesses, the reason that the trial judge refused to require production must have been his determination that the 302's were not "statements" of the witness as defined by 18 U.S.C.A. § 3500(e). The two definitions of "statement" relevant to this case are the (e)(1) definition—"a written statement made by said witness and signed or otherwise adopted or approved by him"—and the (e)(2) definition—"a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporane-

ously with the making of such oral statement." The trial judge made his determination that these 302's were not "statements" solely on the basis of his inspection of the reports.[1]

Our analysis of whether this inspection alone was a sufficient basis for his conclusion is guided by the Supreme Court's decision in *Campbell v. United States*, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961) [*Campbell I*]. In *Campbell I* a government witness testified on cross-examination that he had been interviewed by an FBI agent and that the agent had written down a statement. The witness testified that he thought he remembered the agent reading the statement back to him for his approval, but that he was not sure. The government admitted that it had possession of the typed interview report that the agent had later dictated, but contended that this report fell outside the statute. In discussing the duty of the trial court in making the determination whether a document is a "statement" under the Jencks Act, the Supreme Court reiterated its admonition in *Palermo v. United States*, 360 U.S. 343, 354, 79 S.Ct. 1217, 1226, 3 L.Ed.2d 1287 (1959), that "[i]t is also the function of the trial judge to decide, in light of the circumstances of each case, what, if any, evidence extrinsic to the statement itself may or must be offered to prove the nature of the statement." However, the *Campbell I* Court addressed the facts before it in these words:

> After an overnight recess the trial judge conducted an inquiry without the jury present to take testimony and hear argument of counsel. Plainly enough this was a proper, *even a required,* proceeding in the circumstances. *Determination of the question whether the Government should be ordered to produce government papers could not be made from a mere inspection of the Interview Report, but only with the help of extrinsic evidence.*

365 U.S. at 92, 81 S.Ct. at 425 (emphasis added).

---

1. Actually, the record is silent regarding whether the judge inspected the Tanana 302. The government's brief asserts, however, that this inspection was made. Since we hold that inspection alone was not sufficient in this case, the record's silence does not trouble us.

*Campbell I* promulgated a list of questions which required "the aid of extrinsic evidence . . . to answer." The first several questions in this list focused on whether the interview report was an (e)(1) statement: Did the agent write down what the witness told him at the interview? Did the witness read the notes over to make sure they were right and then sign or otherwise adopt or approve them? Was the interview report a copy of those notes? Following remand, a second appeal ensued, *Campbell v. United States,* 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963) [*Campbell II*]. In *Campbell II* the Court held that the interview report, reasonably found by the district court to be an accurate copy of a written statement made the day after the robbery and adopted by the witness as his own, was producible under (e)(1). The Supreme Court indicated in *Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976), however, that a general approval of the substance of the notes will not suffice under (e)(1):

> Every witness interview will, of course, involve conversation between the lawyer [investigating agent] and the witness, and the lawyer will necessarily inquire of the witness to be certain that he has correctly understood what the witness has said. Such discussions of the general substance of what the witness has said do not constitute adoption or approval of the lawyer's notes within § 3500(e)(1), which is satisfied only when the witness has "signed or otherwise adopted or approved" what the lawyer has written. This requirement clearly is not met when

the lawyer does not read back, or the witness does not read, what the lawyer has written.

425 U.S. at 110 n.19, 96 S.Ct. at 1348.

▉ Although it is conceivable that the circumstances surrounding the making of the 302's here could make them (e)(1) statements, we follow the Second Circuit's holding in *United States v. Lamma,* 349 F.2d 338 (2d Cir. 1965), that no hearing was required on the (e)(1) issue where there was nothing before the trial judge to suggest that the witness had ever adopted or approved any notes the government investigator might have written down. In *Campbell I,* the witness testified that he vaguely remembered that notes had been read back to him and that he may have signed something. In *Lamma* the Second Circuit held that only if there is something in the witness' testimony or on the document containing the written statement that suggests that there may have been an adoption or approval by the witness does the trial judge have a duty to conduct a *voir dire* to determine whether or not there was such adoption or approval. Otherwise, a duty would rest with defense counsel to initiate the inquiry.[2]

▉ The final of the *Campbell I* prescribed questions was the following: "[W]as the Interview Report a substantially verbatim recital of an oral statement which the agent had recorded contemporaneously? If extrinsic evidence established this the report would be producible under subsection (e)(2)." 365 U.S. at 94, 81 S.Ct. at 426. Under *Campbell I* standards, a hearing was

2. The ease with which defense counsel can initiate such an inquiry is illustrated by the interrogation of the first witness in this case regarding the circumstances of his interview by the FBI agent. After defense counsel initiated the discussion about the 302, the trial judge instructed the prosecutor to develop what information, if any, the witness had about the document. The questioning went as follows:

> Question: . . . the interview that took place on the 9th, with Mr. Tanana and Mr. McGibbs, did they ever on that occasion read anything back to you or ask you, is this your testimony and read a statement to you? Answer: No, sir.

> Question: Did they at any time after that date present a certain typewritten page or pages to you and say is this your testimony? Answer: I beg your pardon? Question: Have you ever seen this piece of paper which I have in my hand? Don't read it out. Answer: No sir, I have never seen that piece of paper there.

*Campbell I* emphasizes that generally the witness should not be allowed to inspect the interview report, and that consequently there may be occasions when it is necessary for the judge to call the interviewing agent.

required in this case since it is unclear from an inspection of the 302's whether they are transcripts of substantially verbatim recordings of oral statements of the witness recorded contemporaneously with the making of the statements, and thus producible under (e)(2).

In many cases an inspection of the document alone will allow the court to make the (e)(2) determination. The Supreme Court's remand on this issue in *Campbell I* teaches this is not such a case. Consequently, we remand to the district court to determine whether these 302's are (e)(2) statements. The court should call the agents who interviewed Barnett and Beasley or otherwise ascertain whether the interview report was "a substantially verbatim recital of an oral statement which the agent had recorded contemporaneously." *See Campbell I,* 365 U.S. at 94, 81 S.Ct. at 426. If the court concludes to reaffirm its former ruling, it should supplement the record with new findings and enter a new final judgment of conviction. If the court concludes that the government should have been required to deliver the 302's to Judon, then the court should vacate the judgment of conviction and give Judon a new trial. *See id.,* 365 U.S. at 99, 81 S.Ct. at 428–29.

■ Judon's trial counsel also asked the court to inspect the 302's for any *Brady* material. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment . . ." This court has interpreted *Brady* to require the production of impeaching evidence which is materially favorable to the accused. *See Williams v. Dutton,* 400 F.2d 797 (5th Cir. 1968). The Barnett 302 concluded with

> Barnett was shown two volumes of Tuscaloosa Police Department robbery mug books and chose photograph number 41 (Thomas Kenney) as being similar to the robber.

The Beasley 302 concluded with

> Beasley viewed mug files from Tuscaloosa, Alabama Police Department mug book # 1 and showed the photograph # 53 of Alford Paster and the mug book # 2, photograph # 218 of Dwight Gilpa . . . as resembling the individual who robbed [the savings and loan branch].

Judon has never seen these 302's, so 'he could not have known that a potential *Brady* issue was presented in this record. As a matter of fundamental fairness, we consider this issue in the unique circumstances present here.

This circuit applies a strict standard when evaluating the materiality of an asserted *Brady* violation. *See United States v. Crockett,* 534 F.2d 589 (5th Cir. 1976). To reach the level of constitutional significance the nondisclosed evidence must be "crucial, critical, highly significant"; it must be "significantly important in determining the truth of the charges and . . . have a serious bearing on the fundamental fairness of the trial." *Calley v. Callaway,* 519 F.2d 184, 221–22 (5th Cir. 1975), and cases cited therein. *Calley* also speaks to the applicable standard when the undisclosed testimony is asserted to have been necessary for adequate cross-examination:

> . . . [W]hen *Brady* is invoked to obtain information not favorable on the issue of guilt or innocence but useful for attacking the credibility of a prosecution witness, the information withheld must have a definite impact on the credibility of an important prosecution witness in order for the nondisclosure to require reversal.

519 F.2d at 222.

The nondisclosed evidence in this case does not meet that standard. Though Barnett and Beasley were important prosecution witnesses, the information in the 302's would not have had a definite impact on their credibility. There is no indication that these witnesses positively identified the mug file pictures as being the robber; rather, they said no more than that the pictures looked "similar to" and "resembled" the robber. In addition, both 302's included a specific description of the robber

which tallied with each other and bore a marked similarity to the physical characteristics of Judon.[3] The Barnett interview 302 stated that if she were to observe the robber again she could positively identify him. Both witnesses positively identified Judon at trial, and their qualified observations about mug shot similarities or resemblances could have had little, if any, effect on the credibility of these in-court identifications. Consequently, we find no *Brady* violation.

The final issue on this appeal involves the admission into evidence of a memorandum containing a description and the license number of Judon's car. C. M. Matheson, the prosecution's first witness, testified that he was in the vicinity of the savings and loan branch shortly before the robbery and that he had observed a car being driven around a parking lot near the branch in a suspicious manner. Matheson identified a deposit slip envelope and testified that on the day of the robbery he had written down a description of the car and the tag number of the car on that envelope. This memorandum was offered "for the fact it bears the tag number that he saw on the car in question in this case," and defense counsel objected on the grounds of hearsay. In particular it was complained that no predicate for an exception had been laid. The memorandum was not only read into evidence, but it was also admitted as an exhibit. Matheson identified Judon as the driver of the car, and Judon later testified that he owned a car matching the description that Matheson had written down and that his license tag number was the same as that on the memorandum.

■ The admissibility of this document is governed by Fed.R.Evid. 803(5), which prescribes the conditions under which recorded recollection qualifies as an exception to the hearsay rule:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

It is clear from the second sentence of this rule that the admission of this memorandum as an exhibit was error. The drafters precluded the receipt of recorded recollection as an exhibit of the proponent of the memorandum in order to prevent the trier of fact from being overly impressed by the writing. 11 J. Moore, Federal Practice § 803(5)[5] (1976).

■ This memorandum may have qualified as a hearsay exception; however, the record reveals no proper predicate had been laid to show its admissibility as such. In particular, there was no showing that the witness had insufficient recollection to enable him to testify fully and accurately at trial. The Advisory Committee deemed this requirement desirable, since its absence "would encourage the use of statements carefully prepared for purposes of litigation under the supervision of attorneys, investigators, or claim adjusters." *See* 11 J. Moore, Federal Practice § 803(5)[4] (1976). Additionally, we note that there was no specific testimony that the recording reflected the witness' knowledge correctly when the matter was fresh in his memory.

This failure to adhere to the requirements of the Federal Rules of Evidence compounds the error in admitting the document in evidence. However, should the trial court determine on remand that the Jencks Act was not violated, no new trial would be required on this basis because the proof of guilt on this case was so overwhelming that this latter evidentiary error

---

**3.** Judon's physical characteristics appear to be singular. At oral argument he was described as being light-complexioned, of slender build, and, most importantly, six feet eight inches tall. His description in Barnett's 302 contained the following characteristics: 6'6" or taller, thin, light complexioned. The corresponding characteristics in Beasley's 302 are 6'7", very slender, and very light.

would be harmless beyond a reasonable doubt.[4]

The judgment of conviction and order of commitment is vacated and the cause is remanded for further proceedings consistent with this opinion.

VACATED AND REMANDED.

---

4. Besides the testimony discussed in this opinion, there were several other persons who testified that they had observed Judon in the vicinity of the savings and loan branch near the time of the robbery. There was physical evidence that also tended to establish Judon's presence near and inside the branch. Finally, the government successfully discredited Judon's alibi defense.