UNITED STATES of America, Plaintiff-Appellee,

v.

James Edward GASTON, Defendant-Appellant.

No. 79–5248
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Dec. 19, 1979.

* Fed.R.App.P. 34(a); 5th Cir. R. 18.

608

Gary Wayne Barrick, Lakeland, Fla., for defendant-appellant.

Herbert H. Henry, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before AINSWORTH, FAY and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

Appellant, James Gaston, was convicted of obstruction of justice, 18 U.S.C. § 1503,[1] in the United States District Court for the Northern District of Alabama.

### Evidence Adduced at Trial

At the risk of compounding the confusion inherent in the facts of this case, we here set out in some detail the nature of the evidence adduced at trial which is important to an understanding of this case and of our holding. As will be apparent, the jury was presented with a series of inconsistent statements and conflicting testimony, a situation which is particularly significant in view of the fact that the gravamen of the offense as charged was that Defendant Gaston knowingly tried to influence a prospective grand jury witness to give false testimony.

Gaston, a coal broker, had a contract to supply coal to the Tennessee Valley Authority. It appears that the two sources from which Gaston supplied coal under the contract were a pit owned or operated by Murray Trimble and a pit mined by Johnny Harper, who operated K&C Coal Company. The TVA terminated the contract when it discovered that some truckloads of coal supplied by Gaston had been improperly loaded so that a layer of good quality coal covered a substantial amount of inferior quality

---

1. 18 U.S.C. § 1503 provides in pertinent part as follows:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, . . . or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

coal. When Gaston was informed that the contract had been terminated, and why, he went to the offices of K&C Coal Company and spoke to Harper. As a result of this meeting, Gaston obtained a statement signed by Johnny Self, witnessed by Harper, to the effect that he, Self, as the loader, was responsible for the improper loading. Gaston submitted Self's statement to the TVA. Self later repeated the substance of his initial statement in sworn statements to FBI Agent Deffenbeaugh and to Gaston's attorney. Although it was ambiguous in the initial statement, in these two later statements Self asserted that he was employed by Trimble Coal Company at the time of the improper loading. At one point, Gaston, Trimble and Self met with TVA authorities at Trimble's pit and Self was introduced to the TVA authorities as the Trimble loader who made the statement. Gaston allegedly met with Trimble and Self on one other occasion to discuss ways in which it might be made to appear that Self was employed by Trimble, such as issuing a backdated payroll check to Self.

When Self was subpoenaed to testify before a grand jury investigating the matter of false claims or statements made to the TVA, he changed his story. Although he never testified before a grand jury, Self spoke to FBI Agent Deffenbeaugh and repudiated his earlier statement, this time stating that he worked for Harper at the time of the improper loading and that he never worked for Trimble. Trimble initially told TVA officials and Agent Deffenbeaugh that Self was his employee and had done the improper loading, but he later repudiated this statement and claimed that Self had never been his employee and that he had done the improper loading himself. According to Self, Gaston offered him five hundred dollars for making the initial statement, and when Self was subpoenaed before the grand jury, Gaston warned him not to change the story. It is this latter allegation, which Gaston denies, that forms the basis of the offense of which Gaston was found guilty.[2]

### Request for Material Under Jencks and Brady

At trial, during a bench conference and subsequent recess, Gaston's counsel requested any prior statements of witnesses who had testified, including any interview reports prepared by the FBI agents who investigated the case on FD–302 forms (commonly called 302s), to which he might be entitled under the Jencks Act, 18 U.S.C. § 3500, or under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court called upon the prosecutor to comply with the request, and three statements that had been signed by Self and Trimble were given to defense counsel as *Jencks* material. The prosecutor acknowledged that there were also 302s based on Agent Deffenbeaugh's interviews of two other witnesses, Donnie Hicks, of Hicks Trucking Company, and Johnny Harper, of K&C Coal Company, but asserted that the defense was not entitled to them under either *Jencks* or *Brady.* The prosecutor, in the presence of the court, asked Agent Deffenbeaugh if he knew of any interviews, other than the three that had been given the defense, that had been subscribed or adopted by the witnesses, and Deffenbeaugh said no. The next day, in response to questions by the defense attorney on cross-examination, Agent Deffenbeaugh stated that he did not obtain signed statements from Mr. Harper or Mr. Hicks based on his interviews with them. Later, on redirect, Agent Deffenbeaugh stated that in preparing a 302, which he said was not a verbatim transcript, he would dictate from notes taken during the interview. The district court did not conduct an *in camera* inspection of the material, as requested by the defense,

---

**2.** The indictment charges that Gaston "did wilfully and knowingly corruptly endeavor to influence Johnny Self, a witness before the said Grand Jury, [investigating alleged violations of the false claims and false statements laws] and thereby corruptly endeavor to influence, ob-struct and impede the due administration of justice . . . [in that Gaston] urged and advised Johnny Self to give false testimony before said Grand Jury in relation to the aforesaid violation."

and further failed to order the material submitted to the court for possible review on appeal.

On appeal, Gaston asserts as error this failure of the district court and argues that even if the 302s were not producible as statements of Harper and Hicks, they nevertheless were producible as statements of Agent Deffenbeaugh. Appellant also complains that the district court abused its discretion under Fed.R.Evid. 611(b) by permitting cross-examination of Gaston exceeding the scope of the subject matter of his direct examination.

### The Jencks Claim

█ The Jencks Act, codifying the holding in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), requires production, upon motion of the defendant, of any statement, as defined by the Act, within the scope of the subject matter of the direct examination of a government witness who has testified. 18 U.S.C. § 3500(b). The term "statement" is defined as follows:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement. . . .

*Id.* at § 3500(e)(1), (2).

█ As to witnesses Harper and Hicks, the record indicates that the definition contained in subsection (e)(2) of the Act is not met since Agent Deffenbeaugh clearly stated that the 302s were not verbatim transcripts of the interviews. *United States v. Cuesta,* 597 F.2d 903, 913–14 (5th Cir. 1979).

█ Gaston contends, however, that in order to determine whether the 302s met the definition contained in subsection (e)(1), the district court was required to conduct an *in camera* examination of the forms. As authority for this proposition, he cites *Unit-*ed States v. Judon,* 567 F.2d 1289 (5th Cir.), *aff'd per curiam,* 581 F.2d 553 (5th Cir. 1978). In *Judon* the court remanded to the district court for a determination on the (e)(2) issue by extrinsic evidence, such as an examination of the interviewing agents. The court noted that although it was conceivable that the circumstances surrounding the making of the 302s there involved could have made them (e)(1) statements, the duty was on defense counsel to initiate the inquiry into any information the witness might have about the document and the trial court was not required to conduct a hearing on the (e)(1) issue where there was nothing before it in the witness' testimony or on the document in question suggesting adoption or approval by the witness. *Id.* at 1292 (following *United States v. Lamma,* 349 F.2d 338 (2d Cir.), *cert. denied,* 382 U.S. 947, 86 S.Ct. 407, 15 L.Ed.2d 355 (1965)). Gaston points out that in *Judon,* unlike the case at bar, the trial court did make an *in camera* examination of the forms and made them part of the record on appeal. We do not think an *in camera* inspection necessary for a resolution of the (e)(1) issue in this case for two reasons. First, defense counsel failed to initiate an inquiry of the witnesses on this subject which might have triggered the need for further examination. Second, the agent testified that the reports were not signed by the witnesses and the court could have concluded no more on this issue from the face of the forms.

We thus hold that under the circumstances of this case, with respect to the claim that the defense was entitled to the 302s as the statements of witnesses Harper and Hicks under either subsection (e)(1) or (e)(2) of the Jencks Act, the trial court did not err in refusing to inspect the forms *in camera* or in failing to order their production for submission to this court for review on appeal.

█ Assuming that Agent Deffenbeaugh may be considered to have adopted or approved the 302s that he prepared, they might be producible as his Jencks Act statements, but only to the extent that they related to the subject matter of his testimo-

ny. *See United States v. Medel,* 592 F.2d 1305, 1316–17 (5th Cir. 1979); *United States v. Sink,* 586 F.2d 1041, 1050–51 (5th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *United States v. Graves,* 428 F.2d 196, 199–200 (5th Cir.), *cert. denied,* 400 U.S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970). Their permissible use by the defense would have been limited to impeachment of the agent's testimony alone. *See generally* Annot., 5 A.L.R.3d 763, 785–97 (1966). In view of the narrow scope of the agent's testimony concerning Harper and Hicks, which was to the effect that he had interviewed them but had not taken signed statements from them, we think that, as far as the Jencks Act claim is concerned, any error in the trial court's failure to inspect the 302s *in camera* or to order their production was harmless. *United States v. Sink,* 586 F.2d at 1050–51; *United States v. Graves,* 428 F.2d at 199–200.

*The Brady Claim*

■ In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–1197. As this court has previously noted, *"Brady* requires the disclosure of material evidence favorable in the sense of mitigation or exculpation, and also requires the prosecution to disclose evidence important and useful for impeachment purposes." *Calley v. Callaway,* 519 F.2d 184, 221 (5th Cir. 1975) (en banc), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976).

■ In determining whether the nondisclosure of evidence rises to the level of an unconstitutional denial of due process, a strict standard of materiality is applied in the Fifth Circuit. *United States v. Crockett,* 534 F.2d 589, 601 (5th Cir. 1976). Retrial is appropriate only if the withheld evidence requested "creates a reasonable

doubt that did not otherwise exist as to the guilt of the accused." *United States v. Beasley,* 576 F.2d 626, 630 (5th Cir. 1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979), *quoting United States v. Agurs,* 427 U.S. 97, 113, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.").

■ Some cases have upheld a trial court's refusal to conduct an *in camera* inspection of the material sought notwithstanding the unavailability of the material for review on appeal. Reliance on the government's assurances that it is not in possession of any *Brady* material may be sufficient when the defense makes a blanket request for favorable material in the government's file. *See United States v. Gonzalez,* 466 F.2d 1286, 1288 (5th Cir. 1972), *citing United States v. Evanchik,* 413 F.2d 950, 953 (2d Cir. 1969) (denials by the prosecutor and the FBI agent in charge of the case that there was any undisclosed exculpatory evidence were deemed "ample justification for the trial judge's refusal to make an in camera inspection of the government's file, given the absence of any particularized showing by the defendant of materiality or usefulness").

■ The interests which *Brady* protects may be vindicated by an evidentiary hearing alone. *See United States v. Franicevich,* 471 F.2d 427, 429 (5th Cir. 1973) (no error in the trial judge's refusal to conduct an *in camera* examination or to require production of the part of a report withheld by the prosecutor where the court conducted an evidentiary hearing examining the agent regarding the report and the defendant was unable to show any relationship between his case and the balance of the report). *See also United States v. Dinitz,* 538 F.2d 1214, 1224–25 (5th Cir. 1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977) (no error in the trial court's refusal to conduct an *in camera* inspection of records of an FBI investigation of a matter collateral to defendant's case where there was no indication that the rec-

ords contained material information since the defendant's *Brady* theory was highly speculative and was rebutted by two FBI agents).

■ Refusal to conduct an *in camera* review prior to trial of a statement in the possession of the government may not offend *Brady* where the statement is subject to production under the Jencks Act after the witness has testified. *See United States v. Harris,* 458 F.2d 670 (5th Cir.), *cert. denied,* 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972) (no error in the trial court's reliance on the prosecutor's discretion concerning disclosure of a statement which fell within the Jencks Act where there was no showing of material prejudice to defendants resulting from the trial court's failure to comply with their request to review the statement *in camera* prior to trial).

■ Where the evidence requested under *Brady* is sought solely for impeachment purposes, failure to conduct an *in camera* investigation may not warrant reversal if it may be determined that the evidence would not create a definite impact on the credibility of an important government witness. *Calley v. Callaway,* 519 F.2d at 222. In *Calley,* Judge Ainsworth stated:

> [W]hen *Brady* is invoked to obtain information not favorable on the issue of guilt or innocence but useful for attacking the credibility of a prosecution witness, the information withheld must have a definite impact on the credibility of an important prosecution witness in order for the nondisclosure to require reversal. See, e. g., *United States v. Tashman,* 5 Cir., 1973, 478 F.2d 129 (nondisclosure of plea bargaining session pertaining to defendant-turned-witness whose testimony was critically important); *Flanagan v. Henderson,* 5 Cir., 1974, 496 F.2d 1274 (withholding of rape prosecutrix's original affidavit charging another person with crime); *United States v. Deutsch,* 5 Cir., 1973, 475 F.2d 55 (failure to turn over to defense personnel file of witness who "was the government's whole case"); *United States v. Hibler,* 9 Cir., 1972, 463 F.2d 455

(nondisclosure of evidence refuting uncorroborated testimony of key accomplice-witness); *Powell v. Wiman,* 5 Cir., 1961, 287 F.2d 275 (nondisclosure of psychological background of key witness); cf. *Evans v. Janing,* 8 Cir., 1973, 489 F.2d 470 (reversal not required where no significant chance undisclosed evidence would have induced reasonable doubt in jurors' minds).

*Id.* See also *United States v. Crockett,* 534 F.2d 589 (any error in failure to compel disclosure of the rap sheet of an important government witness held insufficient to warrant reversal).

■ The instant case is distinguishable from those in which the trial court's failure to conduct an *in camera* review of the *Brady* material sought has been upheld notwithstanding the unavailability of the material for review on appeal. Gaston's request for material to which he might be entitled under *Brady* was not a blanket request as in *Gonzalez,* but rather a request for specific documents, *i. e.,* the 302s relating to the interviews of Hicks and Harper. No evidentiary hearing was conducted concerning the contents of the reports as it was in *Franicevich.* The statements were not produced pursuant to the Jencks Act as they were in *Harris.* Finally, production of the 302s was sought, not merely for impeachment, as in *Calley,* but also for substantive use as potentially exculpatory evidence. Furthermore, as is evident from the description of the evidence adduced at trial, this is not the rare kind of case in which the uncontroverted evidence so conclusively establishes the guilt of the accused that it may be said that no matter what was contained in the undisclosed material it could not have affected the outcome of the case.

Under these circumstances, we hold that it was error for the trial court to rely on the assurances of the prosecutor and fail to undertake an *in camera* investigation of these 302s. *See Williams v. Dutton,* 400 F.2d 797 (5th Cir. 1968), *cert. denied,* 393 U.S. 1105, 89 S.Ct. 908, 21 L.Ed.2d 799 (1969). As this court recently said in holding that it was error for the trial court,

relying on the prosecutor's assessment of relevancy, not to examine an Internal Revenue Service audit requested by defendant in a suit for failure to report payments on an income tax return, "[i]t is obvious that neither the trial court nor this court can decide cases in a vacuum, nor pass on facts that are not in the record." *United States v. Brown,* 574 F.2d 1274, 1278 (5th Cir.), *cert. denied,* 439 U.S. 1046, 99 S.Ct. 720, 58 L.Ed.2d 704 (1978). *See also Flanagan v. Henderson,* 496 F.2d 1274, 1277 (5th Cir. 1974) (where, in a habeas corpus proceeding based on an appeal record which was limited to minute entries made by the clerk, the court stated that if the supplementary record developed after remand did not conclusively establish the character of the evidence withheld or the lack of defendant's need for it in his defense, then the court was required to examine it *in camera* ). We note that this conviction might not have been subject to attack on *Brady* grounds and that the entire exercise which we have here undertaken could have been obviated had the district court taken the time to examine the 302s *in camera.*

### The Fed.R.Evid. 611(b) Claim

 We find no merit in Gaston's contention that the district court abused its discretion under Fed.R.Evid. 611(b) by permitting cross-examination of Gaston exceeding the scope of the subject matter of his direct examination. It is in the trial judge's discretion to allow a more open cross-examination, *United States v. Herring,* 602 F.2d 1220, 1226 (5th Cir. 1979), and the testimony in question was relevant to Gaston's motive in committing the offense.

The case is remanded to the trial court for the purpose of making an *in camera* examination of the 302s relating to the interviews of Hicks and Harper. In the event the court determines that the 302s contain impeachment evidence that would have a definite impact on the credibility of a key prosecution witness or exculpatory

evidence that is material either to guilt or to punishment and which creates a reasonable doubt as to Gaston's guilt, then the court should grant a new trial. If, on the other hand, the court concludes that the 302s contain no such evidence, then it should enter a new final judgment of conviction, supplementing the record with findings sufficiently detailed to enable Gaston to decide whether to appeal the ruling and to enable this court to review those findings in the event Gaston does appeal.[3] *Cf. United States v. Judon,* 567 F.2d at 1293 (similar remedy with respect to Jencks material).

The judgment of conviction and order of commitment is vacated and the cause is remanded for further proceedings consistent with this opinion.

VACATED AND REMANDED.

---

**3.** If Gaston challenges the trial court's findings, he need not file a new appeal. He may, instead, lodge with this court certified copies of the trial court's findings plus any supplementary briefs and other materials. The matter will be referred to this panel.